RICHARD R. BEST
REGIONAL DIRECTOR
**Sanjay Wadhwa**
**Sheldon L. Pollock**
**Alexander M. Vasilescu**
**Tiantong Wen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0535 (Wen)
went@sec.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>-against-<br><br>**YINGHANG "JAMES" YANG and YUANBIAO CHEN,**<br><br>        **Defendants.** | **COMPLAINT**<br><br>**20 Civ. \_\_\_\_\_ (    )**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Yinghang "James" Yang ("Yang") and Yuanbiao Chen ("Chen") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. Between June and October 2019 (the "Relevant Period"), Defendants engaged in a highly profitable insider trading scheme using information that Yang misappropriated from his employer, a company whose operations include maintaining widely recognized stock market indices ("Company A").

2. During the Relevant Period, Defendants purchased options of fourteen companies in advance of public announcements that those companies would be added to, or removed from, one of three indices maintained by Company A. Yang obtained information about each of those additions or deletions before it was publicly announced, and he either traded on that information or tipped Chen, who then traded on that information. Through this insider trading scheme, Defendants generated more than $900,000 in illicit profits and generated returns on their option purchases as high as 624%.

3. Defendants conducted all of the illegal trades in Chen's brokerage account, which Chen opened approximately one month before Defendants began the illegal trades. Chen misrepresented his trading experience to his brokerage firm ("Brokerage Firm A") in order to obtain options trading authorization for the account.

4. Yang frequently accessed, and even placed certain of the illegal trades in, Chen's brokerage account while connected to the Internet through Company A's servers. By trading in Chen's brokerage account, and not his own, Yang was able to conceal the illegal trading from Company A, which monitored Yang's personal brokerage account.

5. To date, Chen has distributed $221,000 in illicit profits to himself and $100,000 in profits to Yang out of his brokerage account. Defendants paused the illegal trading scheme in October 2019 after they became concerned about certain questions that Chen was asked by Brokerage Firm A about his occupation and sources of wealth.

## VIOLATIONS

6. By virtue of the foregoing conduct and as alleged further herein, Yang and Chen each violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7. By virtue of the foregoing conduct and as alleged further herein, in the alternative, Chen aided and abetted Yang's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

8. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A(a) [15 U.S.C. § 78u-1(a)].

10. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)]; and (c) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa] because certain transactions, acts, practices, and courses of business constituting the violations

alleged herein occurred within this District. Among other things, during the Relevant Period Defendants resided in Queens County and accessed the brokerage account they used to place the illegal trades from locations within Queens County.

## DEFENDANTS

14. **Yang**, age 27, is a resident of Flushing, New York. Since September 2018, Yang has been employed as a Senior Index Manager for Company A, whose operations include maintaining a wide variety of globally recognized valuation and index benchmarks.

15. **Chen**, age 29, is a resident of Corona, New York. Chen is employed as a manager at a sushi restaurant in Ridgewood, New York.

## RELEVANT ENTITIES

16. **Company A** is a New York corporation headquartered in New York, New York. Company A's operations consist of business segments that provide ratings, benchmarks, and research and analytics to capital and commodity markets worldwide.

17. **Brokerage Firm A** is a Delaware Limited Liability Company headquartered in Smithfield, Rhode Island. It is registered with the Commission as a broker-dealer.

## ISSUERS SUBJECT TO THE INSIDER TRADING SCHEME

18. **Axon Enterprise, Inc.** is a Delaware corporation with its principal place of business in Scottsdale, Arizona. It is listed on the NASDAQ under the ticker symbol AAXN.

19. **Cars.com Inc.** is a Delaware corporation with its principal place of business in Chicago, Illinois. It is listed on the New York Stock Exchange ("NYSE") under the ticker symbol CARS.

20. **CDW Corporation** is a Delaware corporation with its principal place of business in Lincolnshire, Illinois. It is listed on the NASDAQ under the ticker symbol CDW.

21. **Cleveland-Cliffs Inc.** is an Ohio corporation with its principal place of business in Cleveland, Ohio. It is listed on the NYSE under the ticker symbol CLF.

22. **Etsy, Inc.** is a Delaware corporation with its principal place of business in Brooklyn, New York. It is listed on the NASDAQ under the ticker symbol ETSY.

23. **Genomic Health, Inc.** is a Delaware corporation with its principal place of business in Redwood City, California. It is listed on the NASDAQ under the ticker symbol GHDX.

24. **Grubhub Inc.** is a Delaware corporation with its principal place of business in Chicago, Illinois. It is listed on the NYSE under the ticker symbol GRUB.

25. **Las Vegas Sands Corp.** is a Nevada corporation with its principal place of business in Las Vegas, Nevada. It is listed on the NYSE under the ticker symbol LVS.

26. **National Beverage Corp.** is a Delaware corporation with its principal place of business in Fort Lauderdale, Florida. It is listed on the NASDAQ under the ticker symbol FIZZ.

27. **Pacira BioSciences, Inc.** is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is listed on the NASDAQ under the ticker symbol PCRX.

28. **PriceSmart, Inc.** is a Delaware corporation with its principal place of business in San Diego, California. It is listed on the NASDAQ under the ticker symbol PSMT.

29. **RPC, Inc.** is a Delaware corporation with its principal place of business in Atlanta, Georgia. It is listed on the NYSE under the ticker symbol RES.

30. **T-Mobile US, Inc.** is a Delaware corporation with its principal place of business in Bellevue, Washington. It is listed on the NASDAQ under the ticker symbol TMUS.

31. **Vector Group Ltd.** is a Delaware corporation with its principal place of business in Miami, Florida. It is listed on the NYSE under the ticker symbol VGR.

## BACKGROUND ON STOCK OPTIONS

32. Options are contracts that give the owner the right, but not the obligation, to buy or sell 100 shares of an underlying stock at a fixed price ("strike price"), on or before a specified future date ("expiration date"). To buy an option, a trader pays an up-front fee known as a premium.

33. A call option gives the owner the right to buy 100 shares of the underlying stock at the strike price, on or before the expiration date. A trader that buys a call option typically believes that the price of the underlying stock will rise. If the stock price rises prior to the expiration date, the call owner can generate a profit by either (i) exercising the option and buying the stock at the strike price, or (ii) selling the option and collecting the difference between the premium he paid and the current, higher premium.

34. A put option gives the owner the right to sell 100 shares of the underlying stock at the strike price, on or before the expiration date. A trader that buys a put option typically believes that the price of the underlying stock will fall. If the stock price falls prior to the expiration date, the put owner can generate a profit by either (i) exercising the option and selling the stock at the strike price, or (ii) selling the option and collecting the difference between the premium he paid and the current, higher premium.

35. A trader that buys an option with an expiration date in the near future believes that the underlying stock price will rise (for a call) or fall (for a put) quickly so that the option does not expire unexercised. If the option expires unexercised, the trader incurs a loss equal to the premium paid.

36. A call option is "out-of-the-money" when its strike price is above the actual price of the underlying stock, and a put option is "out-of-the-money" when its strike price is below the

actual price of the underlying stock. In both cases, there is little to no value to the option owner in exercising the option because he would be buying the stock at a higher price than the current market price (in the case of an out-of-the-money call) or selling the stock at a lower price than the current market price (in the case of an out-of-the-money put).

37. If an option expires when it is out-of-the-money, it expires worthless and the trader loses the premium paid to acquire the option. Therefore, a trader that purchases an option takes the risk that the trader could lose all of the initial investment if the stock price does not move in the anticipated direction.

## FACTS

### I. COMPANY A ENTRUSTS YANG WITH MATERIAL, NONPUBLIC INFORMATION

38. Yang has been employed since September 2018 as a Senior Index Manager with Company A. Company A's operations include maintaining a wide variety of globally recognized valuation and index benchmarks, including stock market indices. These stock market indices are maintained by Index Committees that meet periodically to review, among other things, potential changes to the companies that make up each index.

39. As a Senior Index Manager, Yang helps manage Company A's US-based indices and serves on the Index Committee related to those indices. As a result, Yang is privy to Index Committee discussions and related matters, including the identities of companies that might be added to or removed from one of Company A's US-based indices.

40. Company A takes steps to protect the confidentiality of Index Committee discussions because changes to its indices can be potentially market moving and material. Company A implements a number of procedures and controls to safeguard the Index Committee process, such as limiting the number of individuals with access to information relating to the

Index Committee and encrypting or physically separating documents relating to the Index Committee.

41.     Employees at Company A are bound by Company A's Code of Business Ethics ("COBE"), which prohibits insider trading. In particular, the COBE warns employees:

> During the course of performing your job you may learn Material Non-Public Information about [Company A] or other companies that is not known to the public. You must never use Material Non-Public Information to trade in securities, or share this information with others to trade in securities either for their or your benefit. This violates the law and the COBE; it is unethical and is known as insider trading. Material Non-Public Information is the kind of information a reasonable investor would consider important in deciding whether to buy or sell a security.

42.     Yang owed a duty of trust and confidence to Company A. Yang knew or was reckless in not knowing that information about additions to, or removals from, one of Company A's indices was material, nonpublic information. Yang was obligated to maintain the confidentiality of that information and to refrain from trading based on that information or tipping that information to others in exchange for a personal benefit.

## II.    CHEN PREPARES FOR THE INSIDER TRADING SCHEME BY OPENING A BROKERAGE ACCOUNT AND MISREPRESENTING HIS TRADING EXPERIENCE

43.     To facilitate Defendants' insider trading scheme, Chen opened a brokerage account with Brokerage Firm A on May 22, 2019. Because Defendants' scheme involved options trading, Chen sent an email to Brokerage Firm A requesting options trading authorization for his account. In that email, Chen misrepresented to Brokerage Firm A that he had been "trading stocks and options for years" and had recently switched to Brokerage Firm A because of their better fee structure. In fact, Chen had not previously owned a brokerage account.

44.     In response, Brokerage Firm A directed Chen to fill out an application and to sign an Options Trading Agreement. In that agreement, Chen stated that he had five years of experience with stocks and three years of experience with equity and index options, and that he

had "extensive" experience with the purchase of call and put options and "extensive" or "moderate" experience with other types of options transactions. These were misrepresentations to the brokerage firm in order to secure the ability to trade options.

45. On June 20, 2019, based on Chen's misrepresentations, Brokerage Firm A approved options trading in Chen's brokerage account. Four days later, Yang and Chen began implementing their insider trading scheme.

## III. DEFENDANTS TRADE ON MATERIAL, NONPUBLIC INFORMATION THAT YANG MISAPPROPRIATED FROM COMPANY A

46. Between June 24 and October 2, 2019, Defendants purchased options of fourteen companies that Company A later announced would be added to, or removed from, one of Company A's indices. In each instance, Defendants placed the orders to purchase the options hours before Company A publicly announced that the relevant company would be added to, or removed from, one of Company A's indices. When they placed each of those trades, Defendants knew or recklessly disregarded that they possessed material, nonpublic information about those companies. With the exception of the options of one company, Defendants liquidated those options positions shortly after the announcement, generating over $900,000 in illegal profits. As detailed below and summarized in the table that follows, Defendants invested an increasing amount of money—in turn reaping higher profits—as the scheme progressed.

47. On June 24, 2019, at 4:00 p.m., Defendants placed an order to purchase three call options of Axon Enterprise, Inc. ("AAXN"). After market close that same day, Company A announced that AAXN would be removed from Index C and added to Index B. However, Brokerage Firm A was not able to fill Defendants' order until the next day, and the Defendants allowed the call options to expire.

48. On July 9, 2019, beginning at 1:25 p.m., Defendants paid $504 to purchase eight

9

call options of T-Mobile US, Inc. ("TMUS"). The options were set to expire just ten days later and were out-of-the-money, as the strike price was $77 and TMUS stock had opened at $75.35 that morning. After market close that same day, Company A announced that TMUS would be added to Index A, causing TMUS stock to open 3.74% higher the next morning. The day after the announcement, Defendants liquidated the TMUS options for $1,096 in profits.

49. On July 23, 2019, beginning at 1:50 p.m., Defendants paid $825 to purchase five call options of Genomic Health, Inc. ("GHDX"). The options were out-of-the-money, as the strike price was $60 and GHDX stock had opened at $56.30 that morning. After market close that same day, Company A announced that GHDX would be added to Index C, causing GHDX stock to open 9.05% higher the next morning. The day after the announcement, Defendants liquidated the GHDX options for $1,710 in profits.

50. On July 25, 2019, beginning at 3:46 p.m., Defendants paid $1,600 to purchase 240 call options of Vector Group Ltd. ("VGR"). The options were out-of-the-money, as the strike price was $10 on twenty calls and $12.50 on 220 calls, and VGR stock had opened at $9.31 that morning. After market close that same day, Company A announced that VGR would be added to Index C, causing VGR stock to open 7.62% higher the next morning. Over the next several days, Defendants liquidated their VGR options for $5,750 in profits.

51. On July 31, 2019, beginning at 3:32 p.m., Defendants paid $40 to purchase eight call options of RPC, Inc. ("RES"). The options were out-of-the-money, as the strike price was $7 and RES stock had opened at $6.09 that morning. After market close that same day, Company A announced that RES would be added to Index C, causing RES stock to open 11.97% higher the next morning. Defendants did not liquidate their RES options until two days later, by which time the price of RES stock had fallen. Defendants sold the calls for the same price they purchased

them.

52. On August 1, 2019, at 3:54 p.m., Defendants paid $3,250 to purchase twenty-five call options of Grubhub Inc. ("GRUB"). The options were out-of-the-money, as the strike price was $70 and GRUB stock had opened at $67.56 that morning.

53. Also on August 1, 2019, beginning at 3:57 p.m., Defendants paid $3,520 to purchase forty-four call options of National Beverage Corp. ("FIZZ"). The options were out-of-the-money, as the strike price was $45 and FIZZ stock had opened at $43.71 that morning.

54. After market close on August 1, 2019, Company A announced that GRUB would be added to Index B and FIZZ would be added to Index C, causing GRUB and FIZZ stock to open 3.70% and 8.97% higher, respectively, the next morning. The day after the announcement, Defendants liquidated the GRUB and FIZZ options for $9,600 in profits.

55. On September 6, 2019, at 3:58 p.m., Defendants paid $3,500 to purchase fifty put options of Cars.com Inc. ("CARS"). At 3:59 p.m., Defendants also paid $2,580 to purchase thirty call options of Etsy, Inc. ("ETSY"). The ETSY options were out-of-the-money, as the strike price was $50 and ETSY stock traded between $47.89 and $48.07 at the time Defendants placed their order. After market close that same day, Company A announced that CARS would be removed from Index B and that ETSY would be added to Index B, causing CARS and ETSY stock to open 3.99% lower and 3.38% higher, respectively, the next morning. Defendants liquidated the CARS and ETSY options three days after the announcement for $3,770 in profits.

56. On September 17, 2019, beginning at 3:06 p.m., Defendants paid $18,014 to purchase 311 call options of CDW Corporation ("CDW"). The options were set to expire in just three days and were out-of-the-money, as the strike price was $115 for 192 contracts and $120 for 119 contracts, and CDW stock had opened at $112.68 that morning. After market close that

same day, Company A announced that CDW would be added to Index A, causing CDW stock to open 6.33% higher the next morning. The day after the announcement, Defendants liquidated the CDW options for $112,487 in profits.

57. On September 20, 2019, beginning at 3:56 p.m., Defendants paid $67,230 to purchase 500 call options of PriceSmart, Inc. ("PSMT"). Three hundred and fifty of those calls were out-of-the money, as the strike price was $65 and PSMT stock had opened at $60.70 that morning. After market close that same day, Company A announced that PSMT would be added to Index C, causing PSMT stock to open 10.36% higher the next morning. Defendants liquidated the options three days after the announcement for $225,765 in profits.

58. On September 24, 2019, beginning at 2:37 p.m., Defendants paid $142,400 to purchase 300 call options of Pacira BioSciences, Inc. ("PCRX"). After market close that same day, Company A announced that PCRX would be added to Index C, causing PCRX stock to open 5.30% higher the next morning. The day after the announcement, Defendants liquidated the PCRX options for $71,324 in profits.

59. On September 26, 2019, beginning at 1:48 p.m., Defendants paid $167,529 to purchase 2,392 call options of Las Vegas Sands Corp. ("LVS"). Almost 2,000 of those calls were out-of-the-money, with strike prices between $57 and $60 when LVS stock had opened at $56.19 that morning. After market close that same day, Company A announced that LVS would be added to Index A, causing LVS stock to open 4.78% higher the next morning. Over the next several days, Defendants liquidated the LVS options for $325,956 in profits.

60. On October 2, 2019, beginning at 2:47 p.m., Defendants paid $259,715 to purchase 6,650 call options of Cleveland-Cliffs Inc. ("CLF"). Over one hundred of those calls were out-of-the-money, with a strike price of $8 when CLF stock had opened at $7.10 that

morning. After market close that same day, Company A announced that CLF would be added to Index C, causing CLF stock to open 6.32% higher the next morning. The day after the announcement, Defendants liquidated the CLF options for $155,029 in profits.

**Summary of Defendants' Trading Ahead of Company A's Announcements**

| Date | Options Purchased | Announcement After Market Close | Disposition of Options | Profit or (Loss) | Return on Investment |
|---|---|---|---|---|---|
| 06/24/2019 | AAXN calls | To be removed from Index C and added to Index B | Calls expired | ($405) | -100% |
| 07/09/2019 | TMUS calls | To be added to Index A | Sold on 07/10/2019 | $1,096 | 217% |
| 07/23/2019 | GHDX calls | To be added to Index C | Sold on 07/24/2019 | $1,710 | 207% |
| 07/25/2019 | VGR calls | To be added to Index C | Sold by 08/01/2019 | $5,750 | 359% |
| 07/31/2019 | RES calls | To be added to Index C | Sold on 08/02/2019 | $0 | 0% |
| 08/01/2019 | GRUB calls | To be added to Index B | Sold on 08/02/2019 | $3,000 | 92% |
| 08/01/2019 | FIZZ calls | To be added to Index C | Sold on 08/02/2019 | $6,600 | 188% |
| 09/06/2019 | CARS puts | To be removed from Index B | Sold on 09/09/2019 | $2,000 | 57% |
| 09/06/2019 | ETSY calls | To be added to Index B | Sold on 09/09/2019 | $1,770 | 69% |
| 09/17/2019 | CDW calls | To be added to Index A | Sold on 09/18/2019 | $112,487 | 624% |
| 09/20/2019 | PSMT calls | To be added to Index C | Sold on 09/23/2019 | $225,765 | 336% |
| 09/24/2019 | PCRX calls | To be added to Index C | Sold on 09/25/2019 | $71,324 | 50% |
| 09/26/2019 | LVS calls | To be added to Index A | Sold by 10/03/2019 | $325,956 | 195% |
| 10/02/2019 | CLF calls | To be added to Index C | Sold on 10/03/2019 | $155,029 | 60% |
| | | | **Total Profits and Return on Investment:** | **$912,082** | **136%** |

## IV. YANG CONCEALS THE TRADING FROM COMPANY A

61. Defendants conducted all of the above-described trades in Chen's brokerage account. Yang placed certain of these trades on the basis of material, nonpublic information that he acquired from Company A, while Chen placed certain of these trades on the basis of Yang's illegal tips.

62. Since 2017, Yang has had his own, separate brokerage account with Brokerage Firm A, which he uses to trade, among other things, call and put options. Since Yang joined Company A in September 2018, Company A's compliance department has received copies of Yang's monthly account statements.

63. By placing all of the trades in the insider trading scheme in Chen's brokerage account, Yang was able to conceal the illegal trading from Company A.

## V. DEFENDANTS PLACE THE ILLEGAL TRADES FROM YANG'S RESIDENCE, COMPANY A, AND CHEN'S PLACE OF EMPLOYMENT

64. During the Relevant Period, Chen's brokerage account was accessed by IP addresses[1] assigned to at least the following locations: Yang's home address, Company A, and Chen's place of employment.

65. All of the orders to purchase the AAXN, TMUS, GHDX, CDW, and LVS options were immediately preceded by logins to Chen's brokerage account by IP addresses assigned to Yang's home address.

66. Many or all of the orders to purchase the VGR, CARS, ETSY, PSMT, and CLF options were immediately preceded by logins to Chen's brokerage account by IP addresses assigned to Yang's employer, Company A. Those same IP addresses were also used to log into

---

[1] An IP, or Internet Protocol, address is a unique numerical label (much like a telephone number) assigned to each device connected to a computer network that uses the Internet for communication. An IP address serves two main functions: host or network interface identification and location addressing.

14

Yang's brokerage account during the Relevant Period.

67. All of the orders to purchase GRUB and FIZZ options were immediately preceded by logins to Chen's brokerage account by an IP address assigned to Chen's employer. On the day of those purchases, Defendants had a four minute, forty second telephone call at 2:59 p.m. Thereafter, at 3:18 p.m. and 3:19 p.m., an IP address assigned to Chen's employer logged into the brokerage account, and beginning at 3:54 p.m., the brokerage account placed orders to purchase GRUB and FIZZ call options.

68. All of the orders to purchase RES options were immediately preceded by a login to Chen's brokerage account by an IP address assigned to a fitness center in Corona, New York. That same IP address was also used to log into Yang's brokerage account during the Relevant Period.

69. All of the orders to purchase PCRX options were immediately preceded by logins to Chen's brokerage account by an IP address assigned to Yang's telephone carrier.

70. Yang knew or recklessly disregarded that he breached a duty of trust and confidence owed to his employer when he traded options on the basis of material, nonpublic information that he acquired from Company A and when he tipped Chen with that information.

71. Chen knew, recklessly disregarded, should have known, or consciously avoided knowing at the time he traded, that the information Yang conveyed to him was material and nonpublic, that Yang had breached a duty of trust and confidence to his employer by conveying the information to Chen, and that Yang tipped him for a personal benefit.

## VI. DEFENDANTS SPLIT THEIR ILLEGAL PROFITS AND, UNDER SCRUTINY FROM BROKERAGE FIRM A, PAUSE THE INSIDER TRADING SCHEME

72. In September and October, 2019, Chen transferred a total of $220,000 from the brokerage account Defendants used to conduct the insider trading scheme to two bank accounts

in his own name. In November 2019, Chen also transferred $1,000 from the brokerage account to a separate cash management account he holds with Brokerage Firm A.

73. On October 4, 2019, Chen wrote three checks to Yang totaling $100,000 from the brokerage account.

74. Also on October 4, 2019, Brokerage Firm A sent Chen a letter asking him to fill out a form confirming his occupation and sources of wealth for the account. The letter cited Brokerage Firm A's obligation to maintain and update customer information pursuant to 31 C.F.R. § 1023.210. Receipt of this correspondence led to a series of calls between Chen and Yang on October 12, 2019, followed by a set of coordinated inquiries by Chen and Yang to Brokerage Firm A.

75. On October 13, 2019, Yang called Brokerage Firm A, claiming that he was interested in ordering checks for his account. He stated, however, that he had "heard from [his] friends" who were also customers of Brokerage Firm A that when they wrote checks from their brokerage account, they received a "1023.210" requesting additional information. Yang then pressed the representative from Brokerage Firm A for additional details regarding why Brokerage Firm A may request such information.

76. Shortly after Yang's call to Brokerage Firm A, Chen also emailed Brokerage Firm A to ask about the form he had received. As Yang did in his telephone call, Chen also specifically referenced 31 C.F.R. § 1023.210 in his email. Chen also asked about the letter's warning that his account may be restricted or closed if he did not return the form within 45 days.

77. Two days later, Chen returned the completed form by Priority Mail Express, stating that the primary sources of wealth for his account were "income/salary" and from the "trading of stocks, ETF [sic] and options." Defendants thereafter ceased trading in advance of

16

announcements by Company A regarding additions to, or removals from, one of Company A's indices.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Both Defendants)

78. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 77.

79. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

80. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5
### (Chen)

81. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 77.

82. As alleged above, Yang violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

83. Chen knowingly or recklessly provided substantial assistance to Yang with

respect to his violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

84. By reason of the foregoing, Chen is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Yang's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and, unless enjoined, Chen will again aid and abet these violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Yang and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**II.**

Permanently enjoining Chen and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5] and from aiding and abetting violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5];

**III.**

Ordering Defendants to pay civil monetary penalties under Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)]; and

**IV.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
September 21, 2020

    /s/ Richard R. Best
RICHARD R. BEST
REGIONAL DIRECTOR
Sanjay Wadhwa
Sheldon L. Pollock
Alexander M. Vasilescu
Tiantong Wen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0535 (Wen)
went@sec.gov